## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

|  |  |  |
|---|---|---|
| | ) | |
| | ) | |
| DEMETRIUS HOLLINS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| vs. | ) | |
| | ) | |
| GWINNETT COUNTY, GEORGIA; | ) | CIVIL ACTION NO. _____ |
| CHIEF BUTCH AYERS; SERGEANT | ) | |
| MICHAEL BONGIOVANNI; and | ) | |
| OFFICER ROBERT McDONALD, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## COMPLAINT FOR DAMAGES

**COMES NOW** Plaintiff Demetrius Hollins (hereinafter "Plaintiff"), by and through his undersigned counsel of record and hereby files his Complaint for Damages.

## NATURE OF THE CASE

1.      The above-captioned civil action for damages is brought pursuant to 42 U.S.C. § 1983 and § 1988 for violations of Plaintiff's federal rights as guaranteed by the First and Fourth Amendments of the United States Constitution, and pursuant to Georgia law.

2.     Plaintiff seeks damages for the injuries he sustained as a result of Defendants' unlawful seizure and use of excessive force against him on April 12, 2017.

3.     On said date, based solely on minor traffic infractions he allegedly observed, Defendant Bongiovanni initiated a routine traffic stop of Plaintiff's vehicle and immediately arrested Plaintiff, punched him in the face, and tased him twice without provocation.

4.     After Plaintiff was handcuffed and quietly laying face-down on the ground, not posing any physical threat and not attempting to flee, Defendant McDonald violently kicked Plaintiff in the head and then held Plaintiff at gunpoint, pressing his gun into the back of Plaintiff's head while repeatedly threatening to shoot him and blow his brains all over the street.

5.     Defendants Bongiovanni and McDonald were at all times acting in accordance with and pursuant to the unconstitutional policies, customs, patterns, and/or practices established by Defendant Gwinnett County and Defendant A.A. Butch Ayers, the former Chief of Police who had final decision-making authority with regard to performance of Defendant Gwinnett County's police functions, including but not limited to the hiring, training, supervision, and discipline of police officers employed by Gwinnett County Police Department.

6.     Pursuant to the County's unconstitutional policies and customs, despite 60+ documented use of force incidents prior to the subject incident, based on the documents produced by Gwinnett County in response to the Open Records Act, Defendant Bongiovanni has never once been reprimanded, counseled, or disciplined with regard to the use of force against a citizen, and was instead rewarded and promoted to the rank of sergeant within the police department.

## PARTIES

7.     At the time of the subject incident, Plaintiff Demetrius Hollins was a 22-year old African-American male and resident of the State of Georgia.

8.     At all times material hereto, Defendant Michael Bongiovanni ("Sgt. Bongiovanni" or "Bongiovanni") was a police officer and police sergeant with supervisory authority employed by the Gwinnett County Police Department ("GCPD"), and was acting under color of state law and within the scope of his employment duties as a law enforcement officer pursuant to GCPD's policies, practices, and customs. Defendant Bongiovanni is being sued in his individual capacity.

9.     At all times material hereto, Defendant Robert McDonald ("Officer McDonald" or "McDonald") was a police officer employed by the Gwinnett County Police Department ("GCPD") and was acting under color of state law and within the scope of his employment duties as a law enforcement officer pursuant

3

to GCPD's policies, practices, and customs. Defendant McDonald is being sued in his individual capacity.

10.     Defendant Gwinnett County, Georgia is a local government entity vested with limited powers and authority as provided by state law.

11.     Defendant Chief Butch Ayers is the former Chief of Police over the Gwinnett County Police Department who served from October 2014 to November 2019.

12.     At all material times herein, Chief Ayers, as well as his predecessor Chiefs of Police, was the final policymaker for Gwinnett County and had final decision-making authority with regard to Gwinnett County's exercise of its police powers including but not limited to hiring, retention, termination, training, discipline, and supervision of GCPD officers; establishing and implementing GCPD's official written policies and procedures; and managing, directing, supervising, and controlling GCPD's operation and the administration of GCPD and its disciplinary process (individual references made to GCPD, the Chief of Police, or the County herein are intended to encompass the Chief of Police and the County).

## JURISDICTION AND VENUE

13.     This Court has jurisdiction over the federal claims asserted herein pursuant to 28 U.S.C. §§ 1331 and 1343, and has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

14.     Defendants are residents of the State of Georgia and are subject to the jurisdiction of this Court.

15.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because the subject incident occurred at or near the intersection of Sugarloaf Parkway and Lawrenceville-Suwannee Road in Gwinnett County, Georgia, which is located within the Northern District of Georgia.

16.     Following the subject incident, Defendants Bongiovanni and McDonald were each prosecuted for committing several crimes against Plaintiff which arise out of the same facts and circumstances as the subject incident, including but not limited to multiple charges of aggravated assault with a deadly weapon and battery based on the following conduct: Bongiovanni pointing a taser at Plaintiff; Bongiovanni tasing Plaintiff twice; Bongiovanni punching Plaintiff in the face; McDonald kicking Plaintiff in the face; and McDonald kneeling on Plaintiff while pressing the barrel of a gun into Plaintiff's head.

17.     On June 11, 2019, Bongiovanni entered a plea of *nolo contendere* or "no contest" to, in relevant part, his charges of aggravated assault and battery and was sentenced under the Georgia First Offender Act; Bongiovanni's criminal prosecution did not terminate or conclude until at least six (6) months thereafter when he completed the terms of his sentence under the Georgia First Offender Act.

18.     In February 2020, a jury found McDonald guilty of aggravated assault and battery thereby terminating his criminal prosecution.

19.     The applicable statute of limitations governing the claims asserted herein was tolled from the date of the subject incident on April 12, 2017 through and until the final termination of the criminal prosecutions arising out of the incident. *See* O.C.G.A. § 9-3-99.

## FACTUAL ALLEGATIONS

20.     At approximately 4:30 pm on April 12, 2017, Plaintiff had just gotten off of work and was on his way to his mother's house driving his vehicle, a 1998 red Acura Integra with manual transmission, on Sugarloaf Parkway, and stopped at the red light at the intersection with Lawrenceville-Suwannee Road.

21.     At all material times herein, Plaintiff operated his vehicle in compliance with Georgia law including using proper turn signals when turning and changing lanes.

22.     At all times material hereto, both brake lights on Plaintiff's vehicle were fully operable and the vehicle tag to his vehicle was visible through his rear window.

23.     Bongiovanni claimed in his incident report that he observed that Plaintiff's vehicle was not displaying a proper license plate outside of his vehicle,

that one of the brake lights was not working, and that Plaintiff changed lanes and turned onto Sugarloaf Parkway without using a turn signal.

24.     Bongiovanni activated his blue lights and sirens and initiated a traffic stop of Plaintiff's vehicle while Plaintiff was stopped at the red light at the intersection with no place to go.

25.     While Plaintiff remained stopped waiting at the red light, Bongiovanni walked up to the front driver's side window of Plaintiff's vehicle and asked Plaintiff for his driver's license.

26.     Plaintiff did not physically resist or attempt to flee, and was instead fully compliant and cooperated with Bongiovanni's investigation by handing Bongiovanni his license without incident.

27.     When Bongiovanni began walking away toward his patrol vehicle with his driver's license, Plaintiff silently began recording video on his cell phone.

28.     Plaintiff was not yelling, threatening harm, resisting arrest, attempting to flee, or posing any threat while silently recording video on his cell phone.

29.     Bongiovanni observed Plaintiff recording him and before giving Plaintiff any lawful commands, immediately began shoving Plaintiff to gain control of the phone and attempted to handcuff Plaintiff while he was still seated

inside the driver's seat, yelling that no one was going to record him and that no one would ever find out what happened.

30.     Bongiovanni drew his taser, pointed it at Plaintiff while he was seated in the driver's seat and, for the first time, commanded Plaintiff to exit his vehicle.

31.     Plaintiff immediately complied and exited his vehicle with his hands up without any verbal or physical resistance whatsoever.

32.     Plaintiff calmly exited the driver's seat with both of his hands up and was being fully compliant, was not resisting arrest, waw not attempting to flee, and was not posing any safety threat.

33.     While Plaintiff was calmly standing with his hands up in between Bongiovanni and the driver's door, Bongiovanni suddenly and without warning punched Plaintiff directly in the face using his elbow or forearm (the "elbow strike").

34.     After punching Plaintiff, Bongiovanni called out a "Code 29" over dispatch, alerting other officers that he was in a fight.

35.     Officer McDonald heard Bongiovanni's dispatch communication on his shoulder radio and began driving to the scene.

36.     Seconds after punching Plaintiff in the face without any provocation or justification, and while Plaintiff was not resisting arrest or posing any threat, Bongiovanni tased Plaintiff by drive-stunning him directly in the back of his neck,

which immediately incapacitated Plaintiff and caused his body to start convulsing as it fell limp to the ground next to the front driver's side door.

37.     Within seconds after Plaintiff's body fell limp to the ground and clearly not posing any safety threat, Bongiovanni pointed his taser at Plaintiff on the ground and tased Plaintiff a second time.

38.     After being tased on the ground a second time for no good reason, and in fear that Bongiovanni would continue beating and/or tasing him, Plaintiff immediately placed both of his hands behind his back and began pleading with Bongiovanni in an effort to convince him that he was being fully cooperative.

39.     Bongiovanni ordered Plaintiff to roll his body away from his vehicle into the turn lane.

40.     Plaintiff immediately complied and rolled his body a few feet away from his vehicle as ordered and quietly laid face-down on the ground, keeping both of his hands behind his back at all times.

41.     Bongiovanni bent over Plaintiff while he was lying face-down on the ground and handcuffed both of Plaintiff's hands behind his back without incident.

42.     After handcuffing Plaintiff, Bongiovanni called out a "Code 4" over dispatch thereby alerting responding officers, including McDonald, that there no longer existed any threat and that the suspect had been secured and was under control.

43.     At all times while Plaintiff was handcuffed and laying on the ground, he remained quiet and calm, was not yelling or resisting arrest, was not physically struggling with or threatening Bongiovanni or any other person, was not kicking his legs around or attempting to flee, and was not posing any threat whatsoever.

44.     After receiving Bongiovanni's Code 4 dispatch on his shoulder radio, McDonald arrived at the scene in his patrol vehicle and observed Bongiovanni calmly standing over Plaintiff while he was handcuffed and laying on the ground.

45.     McDonald admitted under oath at his criminal trial that he did not observe anyone fighting or yelling when he arrived at the scene.

46.     Immediately upon exiting his patrol vehicle, McDonald began running directly toward Plaintiff with his gun in hand.

47.     Upon observing McDonald running toward him with his gun drawn, Bongiovanni called out a second "Code 4" over dispatch to reiterate to McDonald that there no longer existed any threat and that the suspect had been secured, but made no effort to intervene to physically stop McDonald.

48.     At all material times herein, McDonald was wearing his shoulder radio which audibly communicated all dispatch calls made by Bongiovanni, including both Code 4 dispatches advising that Plaintiff had been secured.

49.     Despite receiving both Code 4 dispatches advising that Plaintiff had been secured, McDonald nevertheless ran full-speed toward Plaintiff, grabbed onto

Plaintiff's vehicle door to brace himself for impact, lifted his foot to knee-level, and proceeded to violently kick/stomp on Plaintiff's head while Plaintiff was handcuffed, compliant, not resisting arrest or attempting to flee, and not posing any threat on the ground.

50.     Officer McDonald used such significant force to kick Plaintiff that the impact caused Plaintiff's head to bounce off of the ground.

51.     After kicking Plaintiff in the head, and while Plaintiff remained face-down on the ground, handcuffed and not resisting arrest or posing any threat, Officer McDonald forcefully pressed his left knee into the back of Plaintiff's neck and continued kneeling on Plaintiff in this position for approximately 20 seconds.

52.     During the entire length of time that Officer McDonald remained kneeling on Plaintiff, McDonald kept the barrel of his gun pressed directly into Plaintiff's head and repeatedly threatened to shoot Plaintiff and "splatter [his] brains all over the street" if he moved, at which point Plaintiff legitimately believed that the officers were going to kill him.

53.     While Officer McDonald was kneeling on his neck, Plaintiff remained quiet and calm, was not yelling or resisting arrest, was not physically struggling with or threatening the officers or any other person, was not kicking his legs around or attempting to flee, and was not posing any threat whatsoever.

54.    Despite ample time, opportunity, and a clearly established duty to intervene, at no point did Bongiovanni make any effort to stop his immediate subordinate from using excessive force against Plaintiff.

55.    At no point did Bongiovanni reprimand McDonald for gratuitously kicking a handcuffed and compliant suspect in the head or assaulting him with a deadly weapon.

56.    The two officers picked Plaintiff up from the ground and despite Plaintiff being handcuffed, compliant, and not posing any physical threat, nevertheless forcefully slammed Plaintiff's body into the rear trunk of his vehicle and searched him, following which Plaintiff was placed in a patrol vehicle and transported to the jail without incident.

57.    As a result of Defendants' unlawful conduct, Plaintiff sustained significant physical injuries including but not limited to severe burn marks to the back of his neck, a busted lip, and severe swelling and bruising to the majority of his face with permanent scarring to his chin, nose, and lower lip; and the traumatic and unjustifiable abuse of being punched in the face, tased, and kicked in the face by sworn police officers for no good reason, in the middle of a busy public roadway and intersection in broad daylight, has caused significant mental and emotional shock, humiliation, distress and trauma, and serious and ongoing psychological and emotional injuries which Plaintiff still experiences today.

58.     Prior to the subject incident, Bongiovanni reported **sixty-seven (67) use of force incidents** while he was employed as a GCPD police officer.

59.     Based on the records produced by Gwinnett County in response to Plaintiff's request for documents under the Georgia Open Records Act relating to Bongiovanni's disciplinary history and any prior use of force complaints and investigations, GCPD only investigated **4** out of Bongiovanni's 67 prior uses of force incidents, and only did so because a formal citizen complaint was made.

60.     GCPD exonerated Bongiovanni in connection with the 4 use of force investigations it conducted without reprimand, counseling, additional training, or any form of discipline.

61.     Based on the records produced by Gwinnett County in response to Plaintiff's request for documents under the Georgia Open Records Act relating to Bongiovanni's disciplinary history and any prior use of force complaints and investigations, Bongiovanni was <u>never</u> reprimanded, counseled, required to attend additional training, demoted, or disciplined of Bongiovanni's 67 prior uses of force against citizens, and instead closed almost all of those cases without further inquiry.

62.     In or around 2006, Officer Bongiovanni was promoted to the rank of Police Sergeant with supervisory authority over other GCPD officers, including Defendant McDonald.

63.     Despite Bongiovanni's extensive history of using physical force against citizens in 67 prior incidents, Bongiovanni continued receiving glowing reviews in his annual evaluation each year, none of which made any mention of Bongiovanni's use of force.

**COUNT I**
**42 U.S.C. § 1983 and Georgia Law**
**Unlawful Seizure Claims against**
**Defendant Bongiovanni**

64.     At all material times herein, Plaintiff operated his vehicle in compliance with Georgia law including using proper turn signals when turning and changing lanes, the brake lights on Plaintiff's vehicle were fully operable, and the vehicle tag to his vehicle was visible through his rear window.

65.     At all material times herein, neither Bongiovanni nor McDonald were aware of any prior encounter with Plaintiff and did not have knowledge of any information to reasonably indicate that Plaintiff had any prior criminal history, that he was in possession of a weapon, or that he was otherwise armed or dangerous.

66.     Bongiovanni's initial stop of Plaintiff's vehicle was unlawful and was not supported by actual or arguable reasonable suspicion or probable cause to believe that Plaintiff had committed a traffic offense or violated any other law.

67.     Even if the initial stop was lawful at its inception, Bongiovanni conducted the stop of Plaintiff's vehicle in an objectively unreasonable manner

which every reasonable officer would have known would violate Plaintiff's Fourth Amendment rights.

68.    Bongiovanni was acting solely in retaliation to Plaintiff's exercise of his clearly established First Amendment right to record matters of public interest, including the actions of a police officer in a public place.

69.    Plaintiff was exercising his clearly established First Amendment right to collect and record information regarding police conduct when he began recording his encounter with Defendant Bongiovanni in a public place.

70.    Plaintiff's exercise of his clearly established right to record police conduct did not hinder or obstruct Bongiovanni from performing his duties, nor was it in any manner threatening or inciting violence, obstructing or impeding Defendant Bongiovanni from conducting his traffic stop or performing his lawful duties, or violating any applicable law.

71.    Based solely on Plaintiff's exercise of his right to collect and record information regarding police conduct, and without actual or arguable probable cause, Bongiovanni unlawfully seized and arrested Plaintiff while Plaintiff was still seated in the driver's seat.

72.    At all material times herein, Defendant Bongiovanni intended to punish Plaintiff for his protected First Amendment activity.

73.     Defendant Bongiovanni's retaliatory motive was the exclusive and/or substantial motivating factor behind Plaintiff's arrest, the unlawful manner in which it was conducted, and the subsequent use of excessive force.

74.     Based on clearly established law, every reasonable officer would have known that Defendant Bongiovanni's conduct would violate the First and Fourth Amendments.

75.     Defendant Bongiovanni violated the First and Fourth Amendments and clearly established law when he unlawfully seized and arrested Plaintiff solely in retaliation for recording police activity, which is not a crime and cannot constitute actual or arguable probable cause as a matter of law.

76.     Defendant Bongiovanni is not entitled to qualified immunity and is liable for the damages caused by his unlawful seizure and/or the unlawful manner in which it was conducted in violation of Plaintiff's clearly established First and Fourth Amendment rights.

77.     Defendant Bongiovanni unlawfully seized, confined, and arrested Plaintiff without legal authority or process which constitutes false imprisonment under Georgia law.

78.     Defendant Bongiovanni acted with actual malice and an intent to injure, and is thus not entitled to official immunity under state law.

79.    Plaintiff suffered damages as a direct and proximate result of Defendant's unlawful conduct in violation of federal and state law for which he is liable.

**COUNT II**
**42 U.S.C. § 1983 and Georgia Law**
**Excessive Force Claims against**
**Defendants Bongiovanni and McDonald**

80.    Defendants Bongiovanni and McDonald's use of physical force against Plaintiff was objectively unreasonable and grossly disproportionate to any legitimate law enforcement need such that every reasonable officer would have known would violate Plaintiff's clearly established Fourth Amendment rights, including but not limited to:

- Defendant Bongiovanni shoving Plaintiff while he was seated in the driver's seat while Plaintiff was compliant, not resisting arrest or attempting to flee, and not posing any threat;

- Defendant Bongiovanni punching Plaintiff in the face with his elbow or forearm while Plaintiff was compliant, not resisting arrest or attempting to flee, and not posing any threat;

- Defendant Bongiovanni pointing his taser at and/or tasing Plaintiff twice while Plaintiff was compliant, not resisting arrest or attempting to flee, and not posing any threat – once in the back of the neck and once on the ground;

- Defendant McDonald kicking/stomping on Plaintiff's head after Plaintiff was handcuffed, compliant, and posing no threat on the ground;

- Defendant McDonald kneeling on Plaintiff's neck after Plaintiff was handcuffed, compliant, and posing no threat on the ground;

- Defendant McDonald pointing and pressing the barrel of his gun into Plaintiff's head after Plaintiff was handcuffed, compliant, and posing no threat on the ground; and

- Defendants Bongiovanni and McDonald slamming Plaintiff's body into the trunk of his vehicle after Plaintiff was handcuffed, compliant, and posing no threat.

81.    Defendants used unlawful and excessive force to inflict serious bodily injury to Plaintiff without justification, which constitutes an assault and/or battery under Georgia law.

82.    Defendants aimed a deadly weapon at Plaintiff which placed him in reasonable apprehension of immediately receiving a violent injury, which constitutes an aggravated assault under Georgia law.

83.    Each of Defendants' threats of violence and each of Defendants' unlawful uses of physical force against Plaintiff constitutes an intentional tort under Georgia law.

84.    At the time Defendants used force against Plaintiff without provocation or justification, there existed no actual or arguable probable cause to believe that Plaintiff had committed a serious crime or that he otherwise was otherwise potentially dangerous.

85.    At the time Defendants used force against Plaintiff without provocation or justification, Plaintiff was compliant, not physically resisting, not attempting to flee, and not posing any physical threat whatsoever to the officers or any other person.

86.     Every reasonable officer would have known that the force used by Defendants was objectively unreasonable and grossly disproportionate and would violate Plaintiff's clearly established Fourth Amendment rights.

87.     Defendants are not entitled to qualified immunity for their use of excessive force in violation of clearly established law.

88.     Defendants acted with actual malice and an intent to injure, and are thus not entitled to official immunity under state law.

89.     Plaintiff suffered damages as a direct and proximate result of Defendants' unlawful conduct in violation of federal and state law for which they are liable.

**COUNT III**
**42 U.S.C. § 1983**
**Fourth Amendment Failure to Intervene Claims against**
**Defendant Bongiovanni**

90.     At all relevant times herein, it was clearly established in the Eleventh Circuit that law enforcement officers have an affirmative duty under the Fourth Amendment to intervene to stop the use of excessive force if in a position to do so.

91.     At all material times herein, Defendant Bongiovanni was in a position to intervene to stop Defendant McDonald's gratuitous use of excessive force in kicking Plaintiff and in overtly threatening the use of deadly force against Plaintiff, a handcuffed, non-resisting arrestee who was posing no threat.

92.     Defendant Bongiovanni violated Plaintiff's clearly established Fourth Amendment rights when he failed to stop Defendant McDonald from using excessive force against Plaintiff.

93.     Defendant Bongiovanni is not entitled to qualified immunity and is liable for his failure to intervene in Defendant McDonald's use of excessive force against Plaintiff in violation of clearly established law.

94.     As a direct and proximate result of Defendant Bongiovanni's violation of clearly established law by failing to intervene, Plaintiff suffered damages.

## COUNT IV
## 42 U.S.C. § 1983
## Supervisory Liability Claims against
## Defendant Bongiovanni

95.     At all material times herein, Defendant Bongiovanni was a Sergeant in the Gwinnett County Police Department ("GCPD") with supervisory authority over other GCPD officers, including Defendant McDonald.

96.     Defendant Bongiovanni directly participated in violating Plaintiff's clearly established First Amendment rights by arresting Plaintiff without actual or arguable probable cause solely in retaliation for Plaintiff's exercise of his First Amendment rights in recording police activity in a public place, in violation of clearly established law.

97.    Defendant Bongiovanni directly participated in violating Plaintiff's clearly established Fourth Amendment rights by unlawfully seizing and using excessive force by punching and tasing Plaintiff, in violation of clearly established law.

98.    Defendant Bongiovanni directly participated in violating Plaintiff's clearly established Fourth Amendment rights by failing to intervene to stop his immediate subordinate kicking Plaintiff in the head and thereafter pressing his gun into Plaintiff's head while threatening to shoot and blow Plaintiff's brains all over the street, all while Plaintiff was handcuffed and not posing any physical threat, in violation of clearly established law.

99.    Defendant Bongiovanni is liable under § 1983 in his supervisory capacity for his direct participation in the violation of clearly established law.

100.    After observing Defendant McDonald unlawfully kick Plaintiff in the head, Defendant Bongiovanni did not reprimand his immediate subordinate for his use of gratuitous, excessive force against a handcuffed, compliant suspect, thereby immediately ratifying his conduct.

101.    Defendant Bongiovanni had knowledge that Defendant McDonald would continue acting unlawfully if he was not reprimanded for running up and kicking Plaintiff in the manner that he did.

102.    By failing to reprimand Defendant McDonald for kicking Plaintiff in his immediate presence, Defendant Bongiovanni was deliberately indifferent to the substantial risk of harm that Defendant McDonald would continue using unlawful force against Plaintiff.

103.    Defendant Bongiovanni's decision to turn a blind eye and failure to immediately reprimand his immediate subordinate at the scene in fact emboldened Defendant McDonald to continue using excessive force and to commit an aggravated assault with a deadly weapon by kneeling on a handcuffed, non-resisting arrestee's neck and pressing the barrel of his gun into his head while threatening to "splatter [his] brains" all over the street, with impunity.

104.    As a result of Bongiovanni's deliberate indifference, McDonald kneeled on Plaintiff's neck and pressed his gun into his head while threatening to "splatter [his] brains" all over the street, while Bongiovanni looked on without concern.

105.    Following the subject incident, and before bystander videos began surfacing online, Defendant Bongiovanni falsified his incident report by omitting any reference to McDonald's use of force and was thus prosecuted for preparing a false incident report in violation of his oath of office.

106.    As a direct and proximate result of Defendant Bongiovanni's unconstitutional conduct in his supervisory capacity, Plaintiff suffered damages.

<u>**COUNT V**</u>
<u>**42 U.S.C. § 1983**</u>

22

**<u>Municipal Liability Claims against Gwinnett County</u>**
**<u>for its Unconstitutional Official Use of Force Policies</u>**

107.   At all material times herein, all GCPD officers were required to comply with the official written policies and procedures as established by the Chief of Police and set forth in the GCPD's General Directives Manual.[1]

108.   GCPD's official use of force policy as set forth in GDM § 503.00 expressly authorized officers to use unnecessary, gratuitous, and disproportionate non-deadly physical force against citizens as a matter of routine procedure when making arrests and searches.

109.   GCPD's official use of force policies instruct GCPD officers to use "lawful force" in the routine course of "making lawful arrests and searches," regardless of whether such force is "necessary":

> Lawful force may be used by a police officer in the performance of their duty:
>
> 1.     When necessary to preserve the peace
>
> 2.     When preventing or interrupting a crime or attempted crime against a person
>
> 3.     When preventing or interrupting a crime or attempted crime against property
>
> 4.     **<u>When making lawful arrests and searches,</u>** overcoming resistance to such arrests and searches, and preventing escapes from custody
>
> 5.     When in self-defense or defense of another.

---

[1] References made to GCPD's "official policies" herein are intended to reference the applicable General Directives Manual that was in effect at the time of the subject incident.

GDM 503.03(B).

110.   GCPD's official use of force policy provides blanket authorization to use "lawful force" when making arrests, without consideration of the severity of the crime, the danger to the officer, the risk of flight, or whether the suspect is handcuffed. GDM 503.02 (emphasis added); *see also Lee v. Ferraro*, 284 F.3d 1188, 1198 (11th Cir. 2002) ("*Graham* dictates unambiguously that the force used by a police officer in carrying out an arrest must be reasonably proportionate to the need for that force, which is measured by the severity of the crime, the danger to the officer, and the risk of flight.").

111.   GCPD's official use of force policy states that its purpose "is to provide a framework within which officers and other department employees authorized to carry weapons can properly and lawfully discharge their duties whether or not the situation necessitates the use of force." GDM 503.01.

112.   Section 503.03(E) of GCPD's official use of force policy directs GCPD officers to "employ the following methods or instrumentalities in the application of lawful force" which are listed "from the least severe to the most drastic":

- "Physical strength and skill (neck restraints or similar weaponless control techniques with a potential for serious injury are prohibited)
- Approved baton, or other approved device or instrumentality, when used by one authorized to do so.

(SAPS; Blackjacks, brass knuckles, nunchakus, etc. are prohibited)

- Approved weapons and ammunition."

113.    GCPD's official use of force policy further directs officers to utilize these varying degrees of physical force "under normal circumstances," instructing them to "first exhaust every reasonable means of employing the minimum amount of force before escalating to a more severe application of force." GDM 503.03€.

114.    To determine the appropriate "amount and degree" of physical force an officer is authorized to use in the routine course of making arrests and searches, GCPD's official use of force policy provides the following factors:

1.      The nature of the offense

2.      The behavior of the subject against whom the force is to be used

3.      Actions by third parties who may be present

4.      Physical conditions and tactical considerations

5.      The possibility of creating an unreasonable risk of injury or death to innocent persons

6.      The feasibility or availability of alternative actions

115.    GCPD's official use of force policy makes no reference whatsoever to the *Graham* factors which every officer must consider to determine whether and/or the extent to which physical force is reasonably <u>necessary</u> to make an arrest/search, and instead only provides blanket authorization to officers to use

varying degrees of physical force as a matter of routine procedure when making arrests and searches.

116.   The use of even minimal physical force is not authorized "under normal circumstances."

117.   The United States Supreme Court has repeatedly emphasized that <u>no</u> force is authorized unless there exists an objectively reasonable need to use such force based on the extent of physical safety threat confronting the officer.

118.   GCPD's official written use of force policy directed GCPD officers to violate the Fourth Amendment by instructing officers to use unnecessary force as a matter of routine procedure to accomplish any departmental or police objective when making arrests and searches "under normal circumstances," regardless of whether the suspect is handcuffed and/or not posing any physical threat.

119.   GCPD's official use of force policies authorized GCPD officers to use "lawful" force against non-resisting, cooperative citizens who commit minor traffic offenses and who pose no safety threat to the officer or any other person. GDM 503.02.

120.   GCPD's official use of force policies authorized GCPD officers to use "lawful" and "necessary" force against compliant, handcuffed arrestees in response to minor transgressions. GDM 503.02.

121.    A reasonable officer reading GCPD's written use of force policies would necessarily believe that he/she had blanket authorization to use force as a matter of routine procedure when making arrests and searches, including against handcuffed and/or non-resisting citizens.

122.    Defendants Bongiovanni and McDonald were at all times material herein acting pursuant to the County's unconstitutional official use of force policy when they used unnecessary physical force against Plaintiff in violation of the Fourth Amendment and state law.

123.    Gwinnett County's unconstitutional official use of force policies were the moving force behind and caused Plaintiff injuries.

124.    Gwinnett County is liable for the injuries sustained by Plaintiff as a direct and proximate result of its unconstitutional official use of force policies.

## COUNT VI
### 42 U.S.C. § 1983
**Supervisory and Municipal Liability against Chief Ayers and Gwinnett County for Unconstitutional Policies, Customs, Patterns, and Practices regarding Use of Force Investigations and Failure to Train, Discipline, and Supervise**

125.    At all times material herein, Gwinnett County and Chief Ayers, acting by and through Chief Ayers in his capacity as the final policymaker, had knowledge that Bongiovanni, McDonald, and other GCPD officers throughout the department were violating citizens' rights by routinely using unnecessary physical force when making arrests and searches.

27

126.   Gwinnett County and Chief Ayers had knowledge of a widespread and persistent unconstitutional custom, pattern, and/or practice of GCPD supervisors allowing officers to use unlawful and unnecessary force against non-resisting citizens with impunity, including gratuitously tasing and punching citizens in the face, without any recourse or discipline.

127.   Chief Ayers had knowledge of the importance of properly investigating each officer's use of physical force to determine whether it is objectively reasonable, regardless of the extent of force or injury, and regardless of whether a complaint has been documented.

128.   GCPD's official policies thus require each officer to prepare a written Use of Force Report ("UOF Report") to report each use of physical force against a citizen, regardless of the extent of force or injury, and further require that each supervisor in the officer's immediate chain of command up to the office for the Chief of Police, review and "investigate" the officer's reported use of force "to determine if it is justified and complies with department policy." GDM 503.09-09.

129.   As a matter of widespread and persistent pattern and practice for over 20 years, unless a formal complaint has been made and properly documented, GCPD supervisors throughout the department blindly rubber-stamped and approved officers' UOF Reports without second-guessing or making further any inquiry beyond the information reported by the officer in the Report, and routinely

closed those cases by indicating the same on the officer's UOF Report without making any findings or recommendations, and without taking any further action.

130.   A significant number of the force incidents described in the UOF Reports prepared by GCPD officers and reviewed by GCPD supervisors, contained insufficient information from which, on its face, no reasonable officer could determine whether the use of force described therein was objectively reasonable or justified.

131.   A significant number of the force incidents described in the UOF Reports prepared by GCPD officers and reviewed by GCPD supervisors presented facts and circumstances which, on their face, established that the use of force was unnecessary and objectively unreasonable and deproteinate.

132.   A significant number of the force incidents described in the UOF Reports prepared by GCPD officers and reviewed by GCPD supervisors, contained clearly contradictory facts from which every reasonable officer would have, at a minimum, conducted further inquiry to determine the true state of facts and circumstances surrounding the reported use of force.

133.   Chief Ayers and his predecessor police chiefs had knowledge of, personally reviewed, and approved each Use of Force Report prepared by GCPD officers, as well as each supervisor's decision to close the case without making any investigatory findings or recommendations regarding additional investigation,

counseling, training, supervision, or discipline of the officer with regard to the proper use of non-deadly physical force.

134.   Chief Ayers and his predecessor Chiefs of Police personally reviewed and routinely rubber-stamped supervisors' conclusions regarding Use of Force reports, including the supervisor's decision to close the case without further investigation or inquiry.

135.   Chief Ayers and his predecessor Chiefs of Police had knowledge of, personally reviewed, and approved each of Bongiovanni's 60+ prior use of force incidents, as well as his supervisors' decision to close each of those cases without any further investigation or inquiry, and without making any findings or recommendations.

136.   Almost all of Bongiovanni's prior UOF Reports lacked sufficient information to allow any reasonable supervisor and/or the Chief to conclude that the use of force described therein was objectively reasonable and justified, including but not limited to the surrounding circumstances and interactions with the arrestee before using force, the severity of the crime, and/or whether there existed a sufficient threat which necessitated the use of force.

137.   For example, on March 1, 2016 in connection with Case No. 16C-031, Bongiovanni conducted a routine traffic stop of a vehicle for failure to use proper headlights and thereafter prepared a UOF Report reporting that he used physical

force against the passenger of the vehicle <u>after he had been handcuffed</u> and arrested for failing to properly identify himself to Bongiovanni.

138.   On its face, the information contained in Bongiovanni's UOF Report for Case No. 16C-031 establishes that he unlawfully arrested and used excessive force against the handcuffed passenger without reasonable suspicion or probable cause, based solely on the passenger's failure to properly identify himself.

139.   Bongiovanni's UOF Report for Case No. 16C-031 contains no facts to indicate that Bongiovanni reasonably believed that the <u>passenger</u> of the vehicle had committed a traffic or criminal offense, but nevertheless reported that he demanded that the passenger identify himself and when the passenger refused, Bongiovanni reported handcuffing and arresting the passenger.

140.   Bongiovanni further reported that <u>after handcuffing</u> the passenger, he used physical force to take the passenger to the ground and then "attempt[ed] to gain control and compliance" by grabbing the handcuffed passenger's arm while the other officer at the scene "drew his gun and pointed it at [the handcuffed passenger]."

141.   Despite the absence of any facts to justify Bongiovanni's use of force as objectively reasonable under *Graham v. Connor*, the Chief of Police personally reviewed Bongiovanni's UOF Report for Case No. 16C-031 and approved closing

it without further inquiry or investigation, just as the Chief had done in 60+ of Bongiovanni's other use of force cases.

142.    Similarly, in Case No. 99C-198, Bongiovanni "struck Mr. Jordan in the face with a closed hand to stun Mr. Jordan so that Mr. Jordan would stop his struggling and could be brought under control." GCPD closed the case without further inquiry or discipline and without any recommendation of additional training, counseling, or supervision, which decision as reflected on the UOF Report was personally approved by Chief Ayers in his supervisory capacity as a police major on behalf of the former police chief.

143.    In Case No. 00C-060, Bongiovanni "struck Johnson in the face with my right hand" after taking him to the ground because "Johnson did not listen to [his] verbal commands." GCPD again closed the case without further inquiry or discipline and without any recommendation of additional training, counseling, or supervision, which decision as reflected on the UOF Report was personally approved by Chief Ayers in his supervisory capacity as a police major on behalf of the former police chief.

144.    In Case No. 01C-047, Bongiovanni "struck the left side of [the suspect's] face" with his right forearm because he "ignored my verbal commands and briefly glanced away." GCPD yet again closed the case without further inquiry or discipline and without any recommendation of additional training,

counseling, or supervision, which decision as reflected on the UOF Report was personally approved by Chief Ayers in his supervisory capacity as a police major on behalf of the former police chief.

145.   In Case No. 01C-183, Bongiovanni claimed that he "had no other option but to quickly strike Farmer in the face with my fist once," and then "struck him two to three more times in the face with my fists" because he "was worried that I could be injured if he got a hold of me." After a second officer arrived and struck the suspect two times in the back of his legs with ASP baton, Bongiovanni "struck Farmer in the side of his face again in order to break free from him." GCPD closed the case without further inquiry or discipline and without any recommendation of additional training, counseling, or supervision, which decision as reflected on the UOF Report was personally approved by Chief Ayers in his supervisory capacity as a police major on behalf of the former police chief.

146.   In connection with Case No. 04C-167, Bongiovanni reported that he "punched [the suspect] one time in the back of his head. Bolton fell to the ground and I held him at gun point." GCPD closed the case without further inquiry or discipline and without any recommendation of additional training, counseling, or supervision, which decision as reflected on the UOF Report was personally approved by the police chief.

147.   In connection with Case No. 05C-074, Bongiovanni reported that he "struck [a suspect] 2-3 times in the face so I could stun him in an effort to gain control."  GCPD closed the case without further inquiry or discipline and without any recommendation of additional training, counseling, or supervision, which decision as reflected on the UOF Report was personally approved by the police chief.

148.   In connection with Case No. 05C-116, Bongiovanni reported that he intentionally struck a citizen in the face with his car door without even making the citizen aware that he was a police officer:

NARRATIVE: ( Briefly describe HOW and WHY force was used )

Roets was intoxicated and approached my car.  He did not know I was a Police Officer because I was in plain clothes.  As he lunged at my drivers' side door, I quickly opened the door striking Roets above his nose.  He suffered a minor cut and refused medical treatment.

GCPD closed the case without further inquiry or discipline and without any recommendation of additional training, counseling, or supervision, which decision as reflected on the UOF Report was personally approved by the police chief.

149.   In connection with Case No. 05C-133, Bongiovanni reported that during a routine traffic stop, he tased and drive-stunned a citizen and provided the following scant UOF Narrative:

NARRATIVE: ( Briefly describe HOW and WHY force was used )

Leon was told that he was under arrest and instructed to place his hands behind his back.  He refused and Officer Bradley grabbed his arm.  Leon spun out of Officer Bradleys' grasp and attempted to run off.  I grabbed him with my left hand and applied a drive stun with my M26 Taser.  Leon complied and was placed under arrest.

GCPD closed the case without further inquiry or discipline and without any recommendation of additional training, counseling, or supervision, which decision as reflected on the UOF Report was personally approved by the police chief.

150.    In connection with Case No. 05C-180, Bongiovanni reported that after placing a handcuffed arrestee in the back of his patrol vehicle, Bongiovanni "struck [the handcuffed arrestee] one time with a closed hand." GCPD closed the case without further inquiry or discipline and without any recommendation of additional training, counseling, or supervision, which decision as reflected on the UOF Report was personally approved by the police chief.

151.    In connection with Case No. 06C-253, Bongiovanni reported that he "struck [a citizen] 2-3 times in the face with a closed hand in an attempt to stun him and gain control" in the following UOF Report narrative:

> NARRATIVE: ( Briefly describe HOW and WHY force was used )
>
> I responded as a backup unit to assist Officer Summers on a traffic stop.  Arrocete was the front seat passenger.  Officer Summers pulled Arrocete from the vehicle and directed him to the ground.  Arrocete ignored my verbal commands to place his hands behind his back.  Arrocete then attempted to get up and Officer Summers was trying to grab both of his arms.  Fearing that he would run off or fight with us, I swung my ASP baton and tried to strike him in his leg.  However, because he was moving and resisting arrest, I missed and struck Officer Summers on his ankle.  Arrocete ignored my commands in English of "Stay down!" and "Put your hands behind your back!"so I gave him these same commands in Spanish.  He also refused these commands and still tried to get up.  Fearing he had a weapon and his failure to comply with my commands, I leaned across his body and struck him 2-3 times in the face with a closed hand in an attempt to stun him and gain control.  Arrocete was stunned and Officer Summers was able to place him in handcuffs.

Notably, this UOF report does not give detail as to why the passenger in a traffic stop was pulled from the vehicle and thrown (or "directed") to the ground, or whether there was any reason for Bongiovanni to fear (as he claimed) that the

passenger was armed. Despite the absence of these necessary facts to justify the use of force described by Bongiovanni, GCPD closed the case without further inquiry or discipline and without any recommendation of additional training, counseling, or supervision, which decision as reflected on the UOF Report was personally approved by the police chief.

152.    The above-referenced incidents are only some examples of the 60+ uses of force incidents Bongiovanni reported throughout his career wherein he arrested citizens before conducting any investigation, and thereafter tased and/or punched a citizen in the face despite the absence of physical resistance.

153.    Chief Ayers and his predecessor police chiefs had knowledge of, personally reviewed, and approved Bongiovanni's prior UOF Force reports which demonstrated a clear and consistent pattern of Bongiovanni routinely tasing and/or punching citizens in the face in an effort to gain "compliance" or "control" when making arrests, despite the absence of any facts or circumstances in the Report indicating that the citizen posed any physical threat.

154.    At the very least, Bongiovanni's documented propensity of routinely punching citizens in the face to "gain compliance and control" evidenced the need for additional scrutiny of Bongiovanni's reported uses of force, if not a formal investigation and/or remedial training.

155.    Despite knowledge of Bongiovanni's extensive, documented history of using force against citizens, including his propensity to gratuitously tase and/or punch citizens in the face, GCPD did not make further inquiry beyond the information reported by Bongiovanni in his UOF Report before closing the case, without recommending any discipline or informal reprimand, counseling, or additional training or supervision for Bongiovanni regarding the same.

156.    Despite knowledge of Bongiovanni's. 60+ prior use of force incidents, including two prior incidents involving his immediate subordinate, as a matter of widespread and persistent pattern and practice, GCPD supervisors turned a blind eye and closed 60+ of his cases without further inquiry, and without making any findings or recommendations for additional training, counseling, supervision, or discipline.

157.    Chief Ayers had knowledge of this widespread and persistent pattern and practice allowing the unchecked use of excessive force which existed throughout the department for almost 20 years, and had knowledge of the substantial risk of harm it posed to citizens.

158.    Despite knowledge that Sgt. Bongiovanni had 60+ prior use of force incidents, GCPD promoted him to the rank of police sergeant in or around 2006, thereby vesting him with supervisory authority over subordinate officers.

159.   Despite his 60+ prior unchecked uses of excessive force, on June 15, 2016, Bongiovanni's supervisors applauded him for "establish[ing] himself as a supervisor that leads by example. He is constantly evaluating the performance of his subordinates and make adjustments as needed. He ensures that his subordinates know exactly what is expected of them."

160.   Chief Ayers and his predecessor Chiefs of Police had knowledge that by continuing to employ Bongiovanni as a police officer and supervisor over other officers, there existed a substantial risk that he would cause harm to citizens by using unlawful force during an arrest, but was nevertheless deliberately indifferent to that risk of harm.

161.   Chief Ayers' *de facto* policy of deliberate indifference was the moving force behind Plaintiff's injuries at the hands of Defendant Bongiovanni and his subordinate, Defendant McDonald.

162.   On September 15, 2016 in connection with Case No. 16C-149, less than a year before the subject incident, Bongiovanni and McDonald, his immediate subordinate, reported using physical force during a routine traffic stop.

163.   Bongiovanni's UOF Report for Case No. 16C-149 reported that after stopping a vehicle for a routine traffic stop, Bongiovanni punched the driver of a vehicle in the face two times in an effort to "gain control and compliance."

164.   Bongiovanni further reported that he punched the driver in the face
after McDonald had tased the driver and caused him to fall to the ground,
explaining that he "did not want to strike him in the body because the taser probes
were spread out and could have shocked me."

165.   In connection with the same incident, Officer McDonald prepared a
separate UOF Report wherein McDonald reported that the driver fell to the
ground after McDonald tased him in the back, thereby directly contradicting
Bongiovanni's version of events.

166.   McDonald's UOF Report contained no reference whatsoever to
Bongiovanni striking the suspect in the face, and instead reported that the driver
received "a minor laceration to his face" when he fell to the ground after being
tased in the back, again directly contradicting Bongiovanni's version of events.

167.   Each supervisor in Bongiovanni and McDonald's immediate chains
of command, including the Chief of Police's office, approved the officers'
respective UOF Reports for Case No. 16C-149 without questioning any aspect
regarding the uses of force described therein.

168.   GCPD Major Curtis Clemons thereafter received and reviewed
Bongiovanni and McDonald's UOF Reports for Case No. 16C-149 and
recommended that both officer's reports be forwarded to the IA Unit, which
recommendation Chief Ayers had knowledge of.

169.   On information and belief, and consistent with GCPD's unconstitutional policies, customs, patterns, and practices, GCPD never investigated or forwarded Case No. 16C-149 to the IA Unit and/or the officers never received any additional counseling, training, supervision, or discipline as a result thereof.[2]

170.   A few months later on February 17, 2017 in connection with Case No. 17C-039, Bongiovanni and McDonald were involved in another incident where they both reported using force while responding to another call together.

171.   Bongiovanni reported in his UOF Report that in response to seeing the suspect "struggle with Officer McDonald," he used the following force:

- he grabbed the suspect by the hair and then "conducted 3-4 knee strikes to Crawford's face. This was done in an attempt to gain control and compliance";

- he "conducted 2-3 punches to his torso";

- he "deployed [his] Taser into Crawford's abdomen";

- "the Taser was not effective" because the suspect was "only feeling the effects of the Taser intermittently," and thus tased him a third time;

- and he only "held [the suspect's] left arm" on the ground while Officer McDonald and the third officer at the scene successfully secured both arms behind his back for handcuffing.

---

[2] Prior to filing the instant action, Plaintiff properly served document requests on Defendant Gwinnett County under the Georgia Open Records Act which specifically requested production of the internal affairs files for Defendants Bongiovanni and McDonald; to date, Gwinnett County has not produced any records indicating that the IA Unit ever investigated or was ever forwarded Case Nos. 16C-149 and 17C-039 for investigation.

172.   Officer McDonald prepared a separate UOF Report in connection with Case No. 17C-039 and reported that he was physically struggling with the suspect to "get him to remove his hand from his pocket."

173.   Bongiovanni's UOF Report does not include any indication that the suspect ever had his hand inside his pocket as McDonald claimed in his Report; Bongiovanni's UOF Report stated that the suspect had his hand underneath him, not inside his pocket.

174.   Bongiovanni and McDonald's immediate supervisors including Chief Ayers' office, approved their respective UOF Reports for Case No. 17C-039 without questioning the inconsistencies between Bongiovanni and McDonald's respective UOF Reports.

175.   GCPD Major Curtis Clemons thereafter received and reviewed Bongiovanni and McDonald's UOF Reports for Case No. 17C-039 and recommended that both officer's reports be forwarded to the IA Unit, which recommendation Chief Ayers had knowledge of.

176.   On information and belief, and consistent with GCPD's unconstitutional policies, customs, patterns, and practices, GCPD never investigated or forwarded Case No. 17C-039 to the IA Unit and/or the officers

never received any additional counseling, training, supervision, or discipline as a result thereof.[3]

177.   Chief Ayers and the County had knowledge that Bongiovanni and McDonald had a history of using excessive force when responding to calls together, and had knowledge that there existed a substantial risk of harm to citizens by retaining the officers and allowing them to respond to calls together, but nevertheless took no action to provide additional training, counseling, or discipline to either officer, and further took no action to restrict either of them from responding to calls together.

178.   GCPD supervisors throughout the department have been acting in a similar manner pursuant to GCPD's unconstitutional policies, customs, patterns, and practices regarding use of force investigations, discipline, training, and supervision for over 20 years.

179.   At all material times herein, Chief Ayers and Gwinnett County had knowledge that failing to conduct a proper investigation into an officer's reported use of force, regardless of a documented citizen complaint, and allowing officers

---

[3] Prior to filing the instant action, Plaintiff properly served document requests on Defendant Gwinnett County under the Georgia Open Records Act which specifically requested production of the internal affairs files for Defendants Bongiovanni and McDonald; to date, Gwinnett County has not produced any records indicating that the IA Unit ever investigated or was ever forwarded Case Nos. 16C-149 and 17C-039 for investigation.

to use unchecked physical force against citizens with impunity, created a significant and substantial risk that said officer would unlawfully seize and/or use unnecessary and excessive physical force against citizens in violation of the Fourth Amendment.

180.   Chief Ayers and Gwinnett County allowed GCPD's unconstitutional policies, customs, patterns, and/or practices to continue unchecked for almost 20 years.

181.   GCPD's unconstitutional policies, customs, patterns, and/or practices amount to a municipal policy of deliberate indifference to the need to investigate, train, supervise, and discipline Bongiovanni, McDonald, and other GCPD officers regarding the necessary justification to authorize a lawful seizure and/or the use of physical force, which was the moving force behind and caused Plaintiff injuries.

182.   Chief Ayers' and the County's policy of deliberate indifference to the unlawful use of force against citizens as described herein was the moving force behind the unlawful force used by Bongiovanni and McDonald in connection with the instant case.

183.   Consistent with GCPD's unconstitutional policies, customs, and practices, Defendant Bongiovanni's superiors in the Department expressly praised him for his use of excessive force in this case. Major E. Spellman, who was listening to the radio when Sgt. Bongiovanni was arresting Hollins, texted a message to Sgt.

Bongiovanni saying "GOOD JOB, I MISS THAT KINDA POLICING, U ALWAYS GET MY BLOOD PUMPING, KEEP UP THE GOOD WORK, U R LEADING BY EXAMPLE." Chief Ayers also supported Bongiovanni in public statements after the incident.

184.   Defendants Bongiovanni and McDonald were at all times material herein acting pursuant to the County's unconstitutional policies, customs, patterns, and practices when they used unnecessary physical force against Plaintiff in violation of the Fourth Amendment and state law.

185.   The County's unconstitutional policies, customs, patterns, and practices were the moving force behind Plaintiff's injuries for which Chief Ayers and the County are liable.

<u>**COUNT VII**</u>
<u>**42 U.S.C. § 1983**</u>
<u>**Municipal Liability Claims against Gwinnett County and Chief Ayers**</u>
<u>**for Unconstitutional Policies, Customs, Patterns, and Practices of**</u>
<u>**Manipulating UOF Reports to avoid Discipline and Accountability.**</u>

186.   Given the importance of properly investigating a reported use of excessive force, if a citizen complaint is received, the supervisor who receives the complaint must prepare an Initial Employee Misconduct Report and forward the same to the Office of Professional Standards to open an investigation "without delay." GDM § 326.01, 326.04.

187.   "The Chief of Police is notified of all complaints" made against a GCPD officer. GDM § 326.01.

188.   As a matter of widespread and persistent pattern and practice, GCPD supervisors routinely failed to document the receipt of citizen complaints reporting the use of excessive force and did not prepare an Initial Employee Misconduct Report unless the incident was captured by video and/or there exists widespread media attention associated therewith.

189.   For example, moments after the subject incident's occurrence and well before video of the subject incident began surfacing online, <u>not one but *two*</u> concerned citizens, James Hampton and Danielle Koenig, contacted GCPD and each submitted citizen complaints separately reporting Bongiovanni's use of excessive force to Bongiovanni's supervisor, Lt. James Price.

190.   Lt. Price was required to prepare an Initial Employee Misconduct Report and forward the same to the Office of Professional Standards "without delay" following receipt of the citizen complaints.

191.   After receiving the two separate citizen complaints reporting Bongiovanni's use of excessive force, Lt. Price did not prepare an Initial Employee Misconduct Report and instead falsely coded the status of both complaints as a Code-32 for "No report requested."

45

192.   Like Lt. Price, as a matter of widespread and persistent pattern and practice, GCPD supervisors throughout the department failed to prepare an Initial Employee Misconduct Report and/or properly document citizen complaints reporting an officer's use of excessive force for investigation.

193.   Chief Ayers and his predecessor police chiefs had knowledge that GCPD supervisors routinely failed to prepare Initial Employee Misconduct Reports and/or failing to properly document citizen complaints for investigation, but nevertheless acquiesced and took no action to address the same which longstanding practice and custom represents official municipal policy.

194.   In addition, as a matter of widespread and persistent pattern and practice, GCPD supervisory officials routinely instructed subordinate officers to falsify and/or manipulate their initial UOF Reports to add/remove material facts in an effort to justify the force described therein and avoid further inquiry and/or discipline.

195.   For example, in connection with Case No. 15C-063, Officer McDonald submitted a UOF Report advising that he, along with two other GCPD officers, beat and tased a citizen inside the citizen's bedroom without providing any indication that the citizen was posing any physical threat.

196.   McDonald's UOF Report for Case No. 15C-063 clearly indicated that the civilian, Mr. Dukes, was beaten so severely that "[a]n ambulance was

immediately called to the scene," following which Mr. Dukes was transported to the hospital for further treatment of the injuries he sustained during arrest.

197.   Upon receipt of Officer McDonald's initial UOF Report, for Case No. 15C-063, his supervisors expressly directed McDonald to manipulate his report to provide that the "suspect sustained no injuries," and justified the revision by explaining to McDonald, a rookie officer who had very little law enforcement experience and thus relied on his supervisors for guidance, that the citizen "was not injured during the course of the incident and that the hospitalization was the result of a previous accident," and was thus not "injured/transported to the hospital as a result of actions taken by officers."

198.   Despite knowledge that he called an ambulance to the scene to treat the injuries he knew the suspect sustained during his arrest, McDonald revised his report for Case No. 15C-063 as instructed, following which his supervisors concluded that McDonald's use of force was lawful and closed the case without further inquiry.

199.   Chief Ayers had knowledge of and personally reviewed and approved McDonald's UOF Report for Case No. 15C-063 wherein McDonald's supervisors instructed him to falsify and manipulate his initial report, and approved the decision to close these cases without further inquiry or investigation.

47

200.   Chief Ayers had knowledge of and personally reviewed and approved UOF Reports wherein other supervisors instructed other officers throughout the department to falsify and manipulate his/her initial UOF Reports to avoid investigation and/or discipline, and approved the decision to close these cases without further inquiry or investigation.

201.   Chief Ayers had knowledge of and approved of GCPD supervisors instructing subordinate officers to manipulate their UOF Reports to add/remove material facts to avoid investigation and/or discipline.

202.   GCPD's widespread and persistent unconstitutional custom, pattern, and/or practice of allowing GCPD supervisors to instruct subordinate officers to falsify and manipulate their UOF Reports to avoid investigation and/or discipline amounts to a municipal policy which was the moving force behind and caused Plaintiff injuries.

203.   GCPD officers like Bongiovanni and McDonald had knowledge from personal experience that absent a documented citizen complaint, the process of reviewing UOF Reports was a sham and that GCPD supervisors would not ask any questions and would not impose any discipline for using excessive force.

204.   GCPD's unconstitutional policies, customs, patterns, and practices emboldened GCPD officers to use excessive force with impunity and without fear of repercussion.

205.    Pursuant to GCPD's official written policy, GCPD does not forward any Use of Force Report to the Office of Professional Standards for review and/or inclusion in the "annual analysis of the Department's use of force activities" unless GCPD first determines that the use of force described therein is unjustified and prepares a separate written report containing findings and recommendations based on the same.

206.    The Training Section Director relies on OPS' annual Use of Force Analysis "to determine if additional training in the use of weapons or department policy is necessary," and only receives for review the "unjustified" Use of Force Reports that are included in OPS' annual analysis. GDM 503.09.

207.    Neither the Office of Professional Standards nor the Training Section Director has access to any Use of Force Reports unless it is forwarded by GCPD.

208.    Pursuant to GCPD's official written policy, GCPD does not forward any UOF Reports which have been "closed" without further investigation to the Office of Professional standards or the Training Section Director.

209.    As a result, neither the Office of Professional Standards nor the Training Section Director received or analyzed any of Bongiovanni's 60+ prior uses of force.

210.    GCPD's official written policies regarding Use of Force investigations necessarily preclude the Office of Professional Standards and the Training Section

Director from properly considering and analyzing a significant majority of instances in which a GCPD officer used physical force against a citizen.

211. At all material times herein, Chief Ayers had knowledge that precluding the Office of Professional Standards and the Training Section Director from reviewing/evaluating each officer's reported use of force, regardless of whether the case was closed, created a significant and substantial risk that GCPD officers would not receive adequate training regarding the use of proper physical force and would use unnecessary and excessive physical force against citizens in violation of the Fourth Amendment, but nevertheless allowed these policies to continue.

212. The County's unconstitutional policies, customs, patterns, and practices were the moving force behind Plaintiff's injuries for which Chief Ayers and the County are liable.

## COUNT VIII
## 42 U.S.C. § 1983
## Municipal Liability Claims against Gwinnett County and Chief Ayers for Unconstitutional Policies, Customs, and Practices regarding the Fourth Amendment Duty to Intervene.

213. Plaintiff hereby realleges and incorporates each paragraph alleged above as if fully restated herein.

214.    As a matter of widespread and persistent pattern and practice, GCPD officers routinely failed to intervene in a fellow officer's use of excessive force, and instead assisted in covering up and/or lying to justify another officer's use of force.

215.    In the large majority of Bongiovanni's 60+ prior use of force incidents, including those described above, one or more officers was present and in a position to intervene but did not do so.

216.    At all times material herein, Gwinnett County, acting by and through its final decisionmakers, had knowledge that Defendant Bongiovanni and other GCPD officers throughout the department were routinely violating citizens' rights by failing to intervene in the use of excessive non-deadly physical force.

217.    GCPD did not make any inquiry, investigation, or finding as to any officer's failure to intervene in connection with Bongiovanni's 60+ prior use of force incidents.

218.    Despite knowledge that GCPD officers were violating the Fourth Amendment by not intervening in other officers' uses of excessive force, GCPD took no action to investigate and/or provide additional training, supervision, or discipline to its officers in this regard.

219.    On reasonable information and belief, GCPD has not investigated, reprimanded, disciplined, counseled, trained, or supervised a single officer for

failing to intervene in another officer's use of excessive non-deadly physical force in the 20 years preceding the subject incident.

220.   GCPD's official use of force policy makes no reference whatsoever to an officer's clearly established Fourth Amendment duty to intervene in another officer's use of excessive force if in a position to do so.

221.   GCPD's official written use of force policy was constitutionally deficient for failing to address an officer's constitutional duty to intervene.

222.   GCPD's official policies included no protocol or procedure to provide for investigation and/or discipline of officers for a failure to intervene.

223.   If more than one officer uses force against a citizen during an arrest, it has been GCPD's widespread, persistent, customary pattern and practice to require each officer to prepare separate UOF Reports which only describe his/her particular use of force, and which exclude any reference to other officers' involvement and/or uses of force, thereby reinforcing and emphasizing to officers not to concern themselves with another officer's use of force, much less instruct them to intervene.

224.   At all material times herein, Chief Ayers had knowledge that failing to investigate, train, supervise, and/or discipline officers for a failure to intervene created a significant and substantial risk of injury to citizens with whom GCPD officers regularly come into contact.

225.   Chief Ayers nevertheless turned a blind eye and allowed GCPD's unconstitutional policies, customs, patterns, and/or practices to continue without redress for over 20 years, which amounts to a municipal policy of deliberate indifference.

226.   GCPD's widespread and persistent pattern and practice of turning a blind eye and ignoring the need to investigate, train, supervise, and/or discipline GCPD officers regarding their constitutional duty to intervene amounts to a municipal policy of deliberate indifference which was the moving force behind and caused Plaintiff injuries.

227.   Defendant Bongiovanni was at all times material herein acting pursuant to the County's unconstitutional policies, customs, patterns, and practices when he failed to intervene to stop the use of excessive force against Plaintiff in violation of the Fourth Amendment.

228.   The County's unconstitutional policies, customs, patterns, and practices were the moving force behind Plaintiff's injuries for which Chief Ayers and the County are liable.

## COUNT IX
## Punitive Damages

229.   Defendants' conduct as described herein evidences willful misconduct, malice, fraud, wantonness, oppression, and an entire want of care which is sufficient

to establish that Defendants acted with conscious indifference to the consequences of their actions.

230.   At all material times herein, Defendants acted with malice and/or reckless and callous indifference to Plaintiff's state and federal rights.

231.   Plaintiff is entitled to an award of punitive damages under state and federal law.

## COUNT X
## Attorney's Fees

232.   Because of Defendants' violations of Plaintiffs' federal civil rights, Plaintiff is entitled to an award of costs, including but not limited to reasonable attorney's fees, under 42 U.S.C. § 1988.

233.   Defendants acted intentionally and in bad faith, and have caused Plaintiff unnecessary trouble and expense, entitling Plaintiff to an award of attorneys' fees under O.C.G.A. § 13-6-11.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that he have a trial before a jury on all issues and judgment against Defendants as follows:

(a)   That Plaintiff recover general, compensatory, and punitive damages based on Defendants' violations of state and federal law;

(b)   That Plaintiff recovers reasonable attorney's fees and expenses of litigation under 42 U.S.C. § 1988 and O.C.G.A. § 13-6-11;

(c)     That all issues be tried before a jury; and

(d)     For such other and further relief as the Court deems just and proper.

This 10th day of September, 2021.

/s/ Justin D. Miller
L. Chris Stewart
Georgia Bar No. 142289
Justin D. Miller
Georgia Bar No. 001307
Dianna J. Lee
Georgia Bar No. 163391
*Attorneys for Plaintiff*

STEWART MILLER SIMMONS
55 Ivan Allen Jr Blvd
Suite 700
Atlanta, Georgia 30308
404-529-3476
470-344-6722 (fax)